IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

DUANE WRIGHT,

            **Plaintiff,**

vs.

JOHN FAYRAM, WARDEN;
TRACY DIETSCH, TREATMENT
DIRECTOR; and REVEREND RICK
JENKINS, CHAPLAIN, ANAMOSA
STATE PENITENTIARY.

            **Defendants.**

No. C11-0001

REPORT AND
RECOMMENDATION

---

## TABLE OF CONTENTS

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    A.    *The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    B.    *Nation of Gods and Earths* . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *Wright and the NGE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    D.    *Prison's Accommodations and Objections* . . . . . . . . . . . . . . . . . . . 8

IV.  *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    A.    *Article III Standing - Ripeness Doctrine* . . . . . . . . . . . . . . . . . . . 12
    B.    *Exhaustion of Administrative Remedies* . . . . . . . . . . . . . . . . 15
    C.    *Color of State Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    D.    *Sincerely Held Religious Beliefs* . . . . . . . . . . . . . . . . . . . . . . 18
    E.    *Substantial Burden* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    F.    *Legitimate Penological Objective* . . . . . . . . . . . . . . . . . . . . 23
        1.    *Is There a "Valid Rational Connection" Between the
            Restriction on Group Worship and the Prison's Legitimate
            Interests?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

2.   *Are There Other Ways for Wright to Exercise His Religion Despite the Restriction?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3.   *What Impact Would Group Study Have on Others and on Prison Resources?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

4.   *Are There Alternative Ways to Achieve the Prison's Interests?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

V.   *SUMMARY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VI.   *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## I. INTRODUCTION

This is a prisoner civil rights case under 42 U.S.C. § 1983. Plaintiff-prisoner Duane Wright claims the defendants – employees at the Anamosa State Penitentiary – have violated his First Amendment rights by refusing to officially recognize and accommodate his religious beliefs, and by improperly classifying his religious affiliation as a security threat group. While issues arise regarding the chaplain's role as a state actor and exhaustion of the prison's religious grievance procedures, the principal fighting issues in this case revolve around two questions: (1) whether Defendants' actions improperly infringe on Wright's sincerely held religious beliefs, and (2) whether Wright's request for group worship is not ripe because he is the prison's sole practitioner of his religion.

I recommend the court hold that the Nation of Gods and Earths is a religion for § 1983 purposes, entitled to protection under the Free Exercise Clause of the First Amendment to the Constitution. However, because Wright failed to show the existence of any other Nation of Gods and Earths adherents at the prison, I believe his group worship claims are too speculative to merit Article III standing. Therefore, I recommend that Wright's claims against the prison employees be dismissed.

## II. PROCEDURAL HISTORY

On January 3, 2011, Plaintiff Duane Wright filed an application to proceed *in forma pauperis*, attaching a prisoner's complaint under 42 U.S.C.§ 1983 asking that the prison be ordered to recognize his beliefs and accommodate his request to hold Sunday meetings in the prison chapel. On January 7, 2011, the district court conducted an initial review of the case and permitted the matter to proceed. The Defendants filed an answer on March 31, 2011 admitting some facts alleged by Wright, and denying others. Defendants admit that Wright "has been denied chapel or congregational services on Sundays," but assert that his religious beliefs have been accommodated in other ways. Defendants claim further that Wright failed to exhaust his administrative remedies.

On August 5, 2011, Defendants filed a Motion for Summary Judgment. Defendants claim that the Nation of Gods and Earths ("NGE") is not a "religion" triggering First Amendment protection, but instead is properly considered a security threat group. Alternatively, Defendants argued that "even if the NGE is a religion sincerely held by Wright, the lack of resources outlined by defendants in the Dietsch affidavit demonstrates that the prohibition on congregate services and study groups at the ASP [Anamosa State Penitentiary] chapel is rationally related to legitimate governmental purpose under the *Turner* factors."[1] Upon finding material issues of fact in dispute, the district court denied the motion for summary judgment on January 10, 2012. Pursuant to 28 U.S.C. § 636(b)(1)(B), the district judge referred the case to the undersigned magistrate judge for a report and recommendation. An evidentiary hearing was held at the Anamosa State Penitentiary on February 22, 2012.

---

[1] Defendants' Memorandum in Support of Motion for Summary Judgment (docket number 13-2) at 10.

### III.  FACTS
#### A.  The Parties

Plaintiff Duane Wright ("Wright") is a 51-year-old inmate at the Anamosa State Penitentiary ("the prison").  In 1984, Wright received a life sentence for a first-degree murder conviction, and served 22 years at the Iowa State Penitentiary at Fort Madison before transferring to the Anamosa State Penitentiary in 2006.  He is suing prison employees John Fayram, Tracy Dietsch, and Reverend Rick Jenkins in their capacities as warden, treatment director, and chaplain, respectively.  Wright claims Defendants, acting in their official capacities on behalf of the prison, violated his constitutional rights by refusing to recognize and allow him to fully practice and observe his religion, the Nation of Gods and Earths.

#### B.  Nation of Gods and Earths

The Court's information regarding the Nation of Gods and Earths ("NGE") comes from the following sources:  an online article submitted by Wright as Exhibit A, a "Brief Syllabus of the Nation of Gods and Earths Teaching" prepared by NGE's National Office of Cultural Affairs and introduced by Wright as Exhibit B, Wright's "Request for New Religion, Religious Group or Religious Assistance" identified as Defendants' Exhibit 1, and the testimony of the witnesses at the hearing.[2]  NGE was founded by Clarence 13X, an associate of Malcolm X, in New York City in the 1960s.  Clarence taught Nation of Islam lessons to his followers, "but instead of teaching them to be Muslims, he taught them that they were God the same way he was."[3]  The name "Nation of Gods and Earths" is derived from the belief that male members of the group are "Gods," while females are called "Earths."  Wright explained that women are "symbolic of the earth because the earth nourishes and gives life."  According to Wright, NGE adherents study the Bible, the

---

[2] It should be noted that Wright offered only pages 2, 3, 4, 7, and 8 of 9 in introducing Exhibit A.

[3] *See* Plaintiff's Exhibit A at 3 of 9.

Koran, and the Torah, but believe that "God is in every being and we control the physical earth." According to Wright "we do not believe in no mystery god (unseen)."[4]

The online article submitted by Wright as an exhibit describes NGE as "more of a cultural practice than a religious one."

> The NGE, then, is more of a cultural practice than a religious one and, in fact, the group does not call itself a religion at all. Its position is that it makes no sense to be religious or to worship or deify anyone or anything outside of oneself when adherents themselves are the highest power in the known universe, or Supreme Being, both collectively and individually.

Plaintiff's Exhibit A at 3 of 9. (It should be noted, however, that the quoted section is followed by the notation "[dubious – discuss].") According to Wright, "we don't believe in the word religion."

Similarly, the "Brief Syllabus" prepared by NGE's National Office of Cultural Affairs states that "[w]e are a God Centered Culture; we choose a Cultural path to God rather than your religious one."[5] The syllabus refers to God in the singular and states that NGE "never needed religion because God came to us in the flesh and person of our Father Almighty God Allah."[6] While it is not entirely clear to the Court, this is apparently a reference to Clarence 13X. According to the online article, after surviving a shooting, Clarence 13X assumed the name Allah and, according to some, boasted that he was immortal.[7]

Wright's request for recognition of his religious beliefs, filed with the Iowa Department of Corrections, summarized the basic tenets of the NGE:

---

[4] Wright's Request for New Religion (Defendants' Exhibit 1) at 1.

[5] *See* Plaintiff's Exhibit B at 2.

[6] *Id.*

[7] *See* Plaintiff's Exhibit A at 3 of 9.

> The Nation of Gods and Earths, see the Blackman, and Human as God, we do not believe in no mystery god (unseen). We do not believe in religion, we believe our culture is or is [sic] a way of life. We believe that God comes in the form of Man. We believe in Jesus as our Brother just as other Prophets.

Defendants' Exhibit 1 at 1. Wright further detailed NGE's beliefs at the evidentiary hearing, explaining that man has the attributes of the "supreme being" because man controls the physical earth and has the "highest form of intelligence." To be more god-like, therefore, the NGE pursues the highest form of intelligence in its rituals. According to the syllabus prepared by NGE's Office of Cultural Affairs, NGE adherents seek self-knowledge – knowledge acquired through concepts and lessons on, among others, the Supreme Alphabet and the Supreme Mathematics.[8] According to the syllabus, "Jews speak Hebrew, Gods and Earths speak Mathematics."[9] Other traditional rituals include holding "Universal Parliament" every third Sunday of the month, conducting "Civilization" classes at least weekly, and fasting four times per year in observance of honorary days. To distinguish itself from other faiths, NGE declares itself a "cultural path to God" in contrast to other religious paths to God.

### C.  Wright and the NGE

Wright described his religious history and practice of NGE at the evidentiary hearing. Since his incarceration in 1984 and prior to converting to NGE, Wright has practiced Islamism, Moorish Science Temple, and Nation of Islam. Currently, he attends no other religious services. Wright testified that he began practicing NGE in 2000 with another inmate at the Iowa State Penitentiary in Fort Madison. Wright is the only adherent to NGE at the Anamosa State Penitentiary. Although he claims ten inmates would be interested in NGE if not for the threatened STG ("security threat group") classification, Wright did not call any allegedly interested inmates as witnesses.

---

[8] *See* Plaintiff's Exhibit B.

[9] *Id.*

Wright has discussed starting NGE at the prison since 2007. On January 19, 2010, he completed and returned to Chaplain Jenkins a "Request for New Religion, Religious Group or Religious Assistance" (Form F-1).[10] In the application, Wright requested:

> "that we be allow [sic] to honor all Holy days, receive all lessons from all Gods or Earths. That we be entitled to the same as other Divine Cultures (Religions). That we be allowed our Religious Newspapers (The Five Percenter), be allowed to purchase our universal Flag, all Cassettes, Tapes Lectures."

Defendants' Exhibit 1 at 2. The next day, Chaplain Jenkins completed the prison's assessment of the religious request, recommending it be denied.

Wright complains that when evaluating his religious request, Chaplain Jenkins failed to contact any of the NGE representatives in New York City identified by Wright. Chaplain Jenkins explained that he wanted to contact local representatives, since they understand "how things work around here," and testified that he believed he had enough information about the group itself. Chaplain Jenkins contacted religious coordinators at other state departments of corrections to help determine whether to recognize NGE at the prison. Wright admitted that he never arranged for an NGE advisor to visit the prison because there are no representatives in Iowa, the closest being in Wisconsin or Illinois. Wright's request and the Chaplain's recommendation were forwarded to the Statewide Religion Coordinator for a decision.[11] By that time, however, the coordinator position

---

[10] The evidence suggests that Wright also filed an earlier "Request for a New Religion." In a letter to Wright dated January 12, 2010, Lisa Locoh, who at that time was apparently serving as Statewide Religious Coordinator for the Iowa Department of Corrections, states that she started her position in August 2009 and "I didn't see your request for a new religion." Accordingly, Locoh asked that Wright "send in a new Request for a New Religion form which you can get from Chaplain Jenkins." *See* Letter to Duane Wright from Lisa Locoh, dated January 12, 2010 (docket number 15-1).

[11] According to Iowa Department of Corrections Policy and Procedures, the Statewide Religion Coordinator "shall make the decisions relative to the offender's
(continued...)

was again vacant, and Wright's request never received a final decision.  Wright filed a number of grievances in this regard, but was consistently told that it was "non-grievable." *See* Defendants' Exhibit 3.

The Defendants questioned the sincerity of Wright's NGE beliefs at the evidentiary hearing.  In response to the court's question about his history of disciplinary conduct, Wright testified that he had only one violation while at the prison.  Prison officials later detailed six other citations – ranging from consensual sexual misconduct, to inmate manipulation concerns, to owning or transferring unauthorized items.  Defendants detailed the recent violations in an attempt to highlight the contradiction between Wright's conduct and the NGE's professed "righteous" values.  Though admitting he previously belonged to the Crips, Wright claimed he no longer belonged to any gangs.

## D. Prison's Accommodations and Objections

The prison has accommodated some of Wright's requests regarding the NGE, and denied others.  The prison has accommodated Wright's request to fast on NGE holy days by providing meals to be consumed before dawn and after dusk.  Wright has received some NGE literature ("The Five Percenter" newsletter) that the Publications Review committee deemed appropriate.  When forwarding Wright's request for religious recognition, Chaplain Jenkins recognized Wright's freedom to subscribe to any religious belief, but recommended accommodation be provided "on a solitary basis only."[12]

In his recommendation sent to the Statewide Religion Coordinator, the Chaplain recommended recognition and accommodation of NGE be denied due to five "compelling countervailing considerations."[13]  First, he cited institutional safety and security issues,

---

[11](...continued)
request." *See* Defendants' Exhibit 4.

[12] *See* Defendants' Exhibit 1 at 5.

[13] *Id.* at 4.

describing NGE as "a race-based STG [Security Threat Group]."  Second, Chaplain Jenkins stated, "There is not chapel time/space available without volunteer support." Third, he listed scheduling limitation issues, stating there is "[n]o room at all on Sunday." The fourth and fifth reasons ("excessive administrative burden" and "appropriate supervision unavailable") were listed but not explained.  In recommending denial of the application, Chaplain Jenkins wrote, "This is clearly a Security Threat Group.  Even Mr. Write [sic] states it is not a religion.  Not appropriate for chapel."[14]

Defendants elaborated on these five reasons at the evidentiary hearing, emphasizing two: NGE's security risk and NGE's potential to burden already strained prison resources. With respect to the first, prison warden John Fayram defined a security threat group as "any group of people who would assemble under the pretense to plan, act out, direct, [or] participate in a threat to the security" of the prison.  Although the NGE is not officially classified as an STG at the prison, Defendants cited this concern as a reason to deny Wright's request for religious recognition.  Warden Fayram admitted that he could not attribute any violence to the NGE.

Chaplain Jenkins supported his STG concerns based on the NGE's alleged gang-related and racist traits.  Using online searches, Chaplain Jenkins found information detailing a specific hierarchy used in the NGE, including various member rankings like "cipher," "lieutenant," and "captain."  Since hierarchies are frequently evidence of gangs, and religious symbols like the Supreme Alphabet may be used to mask communications, Chaplain Jenkins concluded that the NGE possessed several gang-related attributes.  In addition, Chaplain Jenkins worried about racism embedded in the NGE.  He noted a document online characterizing the white person as the devil and an inferior race, and

---

[14] *Id.* at 5.

noted language from the Supreme Mathematics proclaiming, "The Supreme Being, Black man who is the Original, is God. . . ."[15]

Wright disputes the allegation of racism, and testified that NGE is open to all races. This view is described in "A Brief Syllabus of the Nation of Gods and Earths Teaching" prepared by the National Office of Cultural Affairs for NGE, and introduced by Wright at the hearing as Exhibit B.

> As Black people it is natural that God reflect our identity. For the NOGE God is Black, for Chinese people God is Chinese, for Indian people God is Indian, for Europeans God is white. No people are monolithic and while naturally these are the facts when it comes to God anybody can embrace God as they see fit. Chinese people can embrace a white version of God, white people can embrace the black reality of God of the NOGE; you understand?   The NOGE denies no man, regardless of color from embracing the reality of God.

Plaintiff's Exhibit B at 2.

Defendants' second principal objection to accommodating NGE group worship is a lack of resources to appropriately staff the chapel. Specifically, Defendants cited several group worship policies and the already-full schedule as further grounds to refuse Wright's request. In the Amended Affidavit attached to their Motion for Summary Judgment, Defendants identify several worship-related policies, including:  "Recognized religions receive one hour of congregate service per week for five or more inmates. Study groups are permitted if there is available space and an outside religious sponsor to provide guidance or leadership."[16]   In response to Wright's request for weekly Sunday worship, Chaplain Jenkins testified that the chapel is extremely busy on Sundays, with different faiths occupying the chapel for nearly seven hours. In addition, due to availability of staff and security issues, religious groups are generally not allowed to meet without an outside

---

[15] *See* Plaintiff's Exhibit C at 3.

[16] *See* docket number 14 at 3.

volunteer leader.  Small groups without an outside leader are still permitted to study, upon request, in the back of the chapel during the worship of other religions.  Wright never requested to use the back of the chapel in this manner.  Defendants also note that Wright has failed to show any NGE doctrine requiring a chapel in which to hold weekly studies or Universal Parliament.  Wright admitted at the hearing that a church or "worship place" is not needed to hold Parliament.

Warden Fayram described the general resource hardships facing the prison.  As a consequence of recent budget cuts, the prison has imposed a series of cost-cutting measures: terminating personnel and leaving staff positions unfilled; closing units of the prison; reducing visiting day benefits of the prisoners; cutting staff training opportunities; reducing the number of staff allowed to take vacation at the same time; maintaining strict hour requirements; dropping funding for routine maintenance; and requiring staff to "cover" unfilled positions like the mail room.  Defendants suggest that granting additional requests like Wright's would only further strain the prison's already-thin resources.

## IV.  DISCUSSION

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987).  "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted).  However, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).  With respect to religion, prison officials must provide inmates a "reasonable opportunity" to exercise their religious freedom and may not unreasonably interfere with an inmate's religious beliefs. *Hudson v. Palmer*, 468 U.S. 517, 523 (1984).  This right stems from the Free Exercise Clause of the First Amendment and is enforceable against state government officials through 42 U.S.C. § 1983.  Prisoners may only assert

11

a § 1983 claim, however, after having exhausted all administrative remedies. *Booth v. Churner*, 532 U.S. 731, 737-41 (2001).

To succeed in this § 1983 action – claiming Anamosa State Penitentiary officials unreasonably restricted Wright's religious beliefs – several elements must be established. First, Wright must show he has Article III standing to pursue a claim for group worship. Second, Wright must exhaust all available administrative remedies prior to filing his suit. Third, the alleged First Amendment violation must be attributed to "state action," not merely private conduct. Fourth, Wright must show his beliefs are in fact religious, not merely moral or philosophical, and said beliefs must have been "substantially burdened" by Defendants. Fifth, such religious beliefs must be sincerely held by Wright. Sixth, the Court must apply the four-factor *Turner v. Safley* test to determine if the prison regulations at issue are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

In most cases, a similarly situated plaintiff asserts a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") in addition to his First Amendment claim. RLUIPA protects religious freedom specifically in state prisons. (Its counterpart, the Religious Freedom Restoration Act of 1993, has been confined to federal prisoner religious protection as a result of *City of Boerne v. Floeres*, 521 U.S. 507 (1997).) RLUIPA affords the same protections as the First Amendment, albeit with a lower burden for the prisoner. *Murphy v. Mo. Dept. of Corrections*, 372 F.3d 979, 989 (8th Cir. 2004). Here, Wright does not assert a RLUIPA claim.

### A. Article III Standing - Ripeness Doctrine

As a threshold matter, the Court must consider whether Wright has standing to seek an accommodation for group worship. The prison asserts that no injury has occurred where it has refused to accommodate group worship of a religion currently comprised of one individual. That is, Defendants argue Wright does not have standing to bring the group accommodation claim and his claim must be dismissed. *See*

FED. R. CIV. P. 12(h)(3). The standing requirement's timing component – the ripeness
doctrine – is most applicable here. Because Wright's claim rests on hypothetical facts and
he has failed to prove that other inmates are interested in participating in group worship,
I recommend the Court deny Wright's request for group worship accommodation of NGE.

The ripeness doctrine is rooted in the "jurisdictional limits of Article III of the
Constitution and policy considerations of effective court administration." *KCCP Trust v.
City of North Kansas City*, 432 F.3d 897, 899 (8th Cir. 2005) (citation omitted). The
ripeness doctrine's basic rationale is "to prevent the courts, through avoidance of
premature adjudication, from entangling themselves in abstract disagreements over
administrative policies, and also to protect the agencies from judicial interference until an
administrative decision has been formalized and its effects felt in a concrete way by the
challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). The
question of ripeness turns on (1) "the fitness of the issues for judicial decision" and
(2) "the hardship to the parties of withholding court consideration." *Id.* at 149. In the
Eighth Circuit, both prongs must be satisfied "to at least a minimal degree." *Nebraska
Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (2000).

The "fitness for judicial decision" prong of *Abbott*'s two-part test addresses a
"court's ability to visit an issue." *Id.* at 1038. It is intended to "safeguard[] against
judicial review of hypothetical or speculative disagreements." *Id.* "A claim is not ripe
for adjudication if it rests upon contingent future events that may not occur as anticipated,
or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

The "hardship" prong of the *Abbott* test goes to the harm resulting to the parties
from delayed review. "'Harm' includes both the traditional concept of actual damages –
pecuniary or otherwise – and also the heightened uncertainty and resulting behavior
modification that may result from delayed resolution." *Nebraska Pub. Power*, 234 F.3d
at 1038 (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733-34 (1998)).
However, "a party need not wait for actual harm to occur"; an action is ripe if a plaintiff

faces an injury that is "certainly impending." *South Dakota Mining Ass'n v. Lawrence County*, 155 F.3d 1005, 1008-09 (8th Cir. 1998). Together, the immediacy and size of the threatened harm must be significant to find ripeness. *Nebraska Pub. Power*, 234 F.3d at 1038.

While Wright requests group worship accommodation, the evidentiary hearing revealed that at the Anamosa State Penitentiary, the NGE is currently a religion of one. According to the prison's policy, no group worship is accommodated until a religious group reaches at least five members. The chaplain testified that Asatru, a religion recognized at the prison, discontinued group worship time because of insufficient turnout. I believe Wright brings his group worship claim prematurely, requesting relief for events which may or may not occur. No certainty exists as to future membership levels. Wright offered no evidence that any other prisoners are interested in attending an NGE civilization class or parliament. Ruling in favor of Wright might never yield relief if other prisoners opt not to follow the NGE. To provide relief on the basis of such speculation would violate the "fitness" prong of the ripeness doctrine. Furthermore, the "hardship" to Wright is minimal because no other prisoners have a current interest in joining him in group NGE studies. Simply put, Wright's request for group meetings is not an issue ripe for judicial resolution.

Wright suggested the NGE's membership level suffers due to the "Security Threat Group" stigma. As set forth below, I believe the NGE is entitled to recognition as a religion and, at this point, the STG classification is unfounded. Resolving these issues allows Wright's premature claim to either ripen or remain unsuitable for judicial resolution. Currently, the prison accommodates the NGE on an individual basis and permits Wright to discuss his NGE beliefs. Because Wright's individual rights (fasting and literature) are accommodated, any hardship resulting to Wright from delaying judgment on his group accommodation claim is minimal.

Wright's claim fails the ripeness requirement and he therefore lacks standing to bring this action. Whether NGE can attract a sufficient following to qualify for group worship is speculative. Because Wright failed to prove the existence of any other members of the NGE at the Anamosa State Penitentiary, his case is not ripe for decision and, therefore, should be dismissed. In the event the district court disagrees with my recommendation in this regard, however, I will address the remaining issues.

### B. Exhaustion of Administrative Remedies

Prior to filing a complaint over prison conditions, a prisoner must exhaust all administrative remedies. 42 U.S.C. § 1997e ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see generally Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). If a prisoner does not exhaust his administrative remedies before filing suit, then "dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003). The defendant bears the burden to show that a plaintiff prisoner failed to exhaust all remedies. *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2001).

There are two administrative procedures applicable here. First is the procedure for "Religious Requests," that is, for "request[ing] recognition of a new religion, religious group, or new religious accommodation." *See* Defendants' Exhibit 4 at 3-4. "[T]he offender shall utilize the following procedure:" (1) the offender completes a request on Form F-1; (2) the chaplain interviews the offender concerning his request; (3) the chaplain completes a Form F-2 assessment of the offender's request; (4) the request is "immediately submitted" to the Statewide Religion Coordinator, who "shall make the decisions relative to the offender's requests"; (5) a copy of the decision is provided to the offender; (6) if he is unsatisfied with the decision, the offender may appeal to the Statewide Religion Review Committee using Form F-4; (7) the Committee decides the appeal at the next quarterly meeting; and (8) the final decision is provided to the offender. The second relevant

procedure ("Religious Grievance Procedure") entails the following steps: (1) the offender must first attempt an informal resolution of the grievance; (2) if unsatisfied, the offender then files a formal grievance on Form F-3; (3) the Statewide Religion Coordinator must provide a written response and recommendation within 45 days; (4) if unsatisfied, the offender may appeal to the Statewide Religion Review Committee using Form F-4; and (5) the Committee notifies the offender of its decision. *See* Defendants' Exhibit 4 at 4-5.

The evidentiary hearing made clear that Wright's requests did not receive proper administrative attention. Accordingly, I believe he has exhausted his administrative remedies. Wright filed his request for religious recognition in January 2010.[17] Chaplain Jenkins promptly submitted Wright's application to the IDOC Statewide Religion Coordinator, together with his recommendation that the request be denied. While Wright's application was pending, however, the Statewide Religion Coordinator apparently left, and the position has not been filled.[18]

After not receiving a response for more than nine months, Wright submitted an "Offender Grievance Complaint," stating that attempts at an informal resolution were unsuccessful. *See* Defendants' Exhibit 3 at 1. The complaint was identified as "Non-Grievable," with the following additional response:

> Religious issues have an appeal process and, therefore, are not grievable through the standard grievance procedure. I have included a religious grievance form, as well as a "request for New Religion" form. These forms should be returned to Associate Warden of Treatment Tracy Dietsch.

Defendants' Exhibit 3 at 3. Apparently not interested in submitting a third "request for new religion" form, after his first two requests had been ignored, Wright filed a "Grievant

---

[17] As noted in Footnote 10 above, Wright apparently filed an earlier request in 2009, but the new Statewide Religion Coordinator "didn't see it" when she started in August 2009 and, therefore, asked that he "send in" a new one.

[18] The record is imprecise regarding when the position was vacated.

Appeal Form" on December 20, 2010. *See* Defendants' Exhibit 3 at 4. Under the Administrative Policy and Procedures adopted by the Iowa Department of Corrections (Defendants' Exhibit 4), this appeal should have been directed to the Statewide Religion Coordinator. As we now know, however, that position was vacant and the grievance was denied by Assistant Deputy Director Sheryl Lockwood as a "Non-grievable matter." *See* Defendants' Exhibit 3 at 6.

Under these circumstances, it is clear that Wright made all reasonable efforts to comply with the administrative remedies provided by the Iowa Department of Corrections. Wright twice filed a request for religious recognition in compliance with the appropriate procedure, and received no response. Wright then filed a grievance regarding the lack of action and was told it was "non-grievable." On appeal, Wright was again told it was non-grievable. The Court concludes that Defendants have failed to meet their burden of proving that Wright failed to exhaust his administrative remedies. *See Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001).

### C. Color of State Law

"[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements of a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). In the brief filed in support of their motion for summary judgment, Defendants assert, in passing, that the decision made by Chaplain Jenkins "was ecclesiastical in nature and, therefore, he was not acting under color of state law for purposes of 42 U.S.C. § 1983."[19]

In support of their position, Defendants cite *Montano v. Hedgepeth*, 120 F.3d 844 (8th Cir. 1997). There, the prison chaplain at the Iowa State Penitentiary prohibited a

---

[19] *See* Defendants' Memorandum in Support of Motion for Summary Judgment (docket number 13-2) at 5.

prisoner practicing "Messianic Judaism" from attending protestant services for one year. The prisoner brought a section 1983 action claiming a violation of his First Amendment right to the free exercise of religion. The Court concluded that "a prison chaplain, even if a full-time state employee, is not a state actor when he engages in inherently ecclesiastical functions (that is, when he performs spiritual duties as a leader in his church)." *Id.* at 851. Finding the chaplain's decision was "premised solely on religious grounds," the Court held the decision "to excommunicate Montano for one year is not conduct that can be fairly attributed to the state," and the action was dismissed. *Id.*

I believe the instant action is easily distinguishable. Here, Chaplain Jenkins was not "perform[ing] spiritual duties as a leader in his church," but instead was acting as a state employee in recommending whether the NGE should be given religious recognition at the prison. That is, while Chaplain Jenkins apparently acts as a spiritual adviser at some times, he was not "engage[d] in inherently ecclesiastical functions" when acting on Wright's application. Instead, I believe the "[p]rison authorities [were] clearly 'persons acting under color of state law' within the meaning of the first element" of *Parratt*. *Thomas v. Gunter*, 32 F.3d 1258, 1259 (8th Cir. 1994). Accordingly, I conclude that Wright has proved that Defendants were acting under color of state law in refusing to allow him group services.

## D. Sincerely Held Religious Beliefs

To successfully prosecute a section 1983 action, Wright must next prove that Defendants deprived him of a right secured by the Constitution. *Parratt*, 451 U.S. at 535. Here, Wright asserts Defendants have prohibited his free exercise of religion, in violation of the First Amendment. In analyzing a Free Exercise claim, the Court considers whether the governmental action "infringes upon a sincerely held religious belief" and, if so, whether "the regulation restricting the religious practice is reasonably related to legitimate penological objections." *Gladson v. Iowa Dept. of Corrections*, 551 F.3d 825, 831 (8th Cir. 2009). Accordingly, the Court must determine whether Wright's adherence to the

NGE is a sincerely held religious belief. "First Amendment protection only attaches to beliefs rooted in religion, as opposed to purely secular beliefs or personal preferences." *Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000). Defendants first argue that the NGE is not a "religion," and assert secondarily that Wright's beliefs may not be "sincerely held."

While the Court is required to determine whether a prisoner's belief system is sufficiently "religious" to merit protection under the Free Exercise Clause of the First Amendment, it can be a difficult task.

> Few tasks that confront a court require more circumspection than that of determining whether a particular set of ideas constitutes a religion within the meaning of the first amendment. Judges are ill-equipped to examine the breadth and content of an avowed religion; we must avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded mere secular beliefs. "Religions now accepted were persecuted, unpopular and condemned at their inception." (citation omitted) Nonetheless, when an individual invokes that first amendment to shield himself or herself from otherwise legitimate state regulation, we are required to make such uneasy differentiations.

*Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981).

In determining in *Love* that the plaintiff's belief system constituted a religion for First Amendment purposes, the Eighth Circuit utilized the three "useful indicia" of a religion described in *Africa*. *Love*, 216 F.3d at 687. Specifically, the Court considered (1) whether the belief system addressed "fundamental and ultimate questions," (2) whether it was "comprehensive," and (3) its "structural characteristics." *Africa*, 662 F.2d at 1033-36. The Tenth Circuit Court of Appeals has identified a more detailed list of factors, including "ultimate ideas," "metaphysical beliefs," "moral or ethical system," "comprehensiveness of beliefs," and ten "accoutrements of religion." *United States v. Meyers*, 95 F.3d 1475, 1483-84 (10th Cir. 1996).

The "Brief Syllabus" prepared by the NGE's National Office of Cultural Affairs describes the NGE as a "God Centered Culture."[20] According to the syllabus, the NGE studies both the Bible and the Quran when "teach[ing] ourselves and others about God." According to the online article, the NGE teaches a system of numbers, called Supreme Mathematics, "that can be compared to the Jewish mystical tradition of Kabbalah, or even more closely related to the Arabic Abjad numerals."[21] The syllabus asserts that "we have the same rights to embrace God as we see him, free from religion. God is not a slave to religion which is a concept created by man to make people rely on their version of God."[22] The syllabus asks that the NGE be permitted to hold "civilization classes" and a monthly "Universal Parliament" in order to "explain our God theology."[23]

Several federal courts have considered whether the NGE constitutes a religion for § 1983 purposes. In the recent case of *Versatile v. Johnson*, 2011 WL 5119259 (E.D. Va.), the Court discussed at length the issue of whether the NGE is a religion for purposes of the RLUIPA. After applying a "modified *Africa/Meyers* test," the Court concluded that the plaintiff had failed to demonstrate that the NGE "contains a unifying comprehensive set of beliefs about ultimate matters, includes metaphysical beliefs, upholds a universal moral or ethical code, or possesses traditional indicia of religiosity." *Id.* at *17. Conversely, a Michigan court recently held that "the NGE's ideology is religious in nature and deserving of RLUIPA protection." *See Hardaway v. Haggerty*, 2010 WL 1131446 (E.D. Mich.) at *3. *See also Marria v. Broaddus*, 2003 WL 21782633 (S.D.N.Y.) (concluding the prisoner's beliefs as a member of the NGE were both sincere and "religious in nature").

---

[20] *See* Plaintiff's Exhibit B at 1.

[21] *See* Plaintiff's Exhibit A at 3-4 of 9.

[22] *See* Plaintiff's Exhibit B at 2.

[23] *Id.* at 3.

The Court is hesitant to declare an individual's beliefs insufficiently "religious" in nature. To argue against religious classification, Defendants rely heavily on the NGE's lack of recognition among state DOCs, as well as NGE's own materials which declare itself "not a religion." The first reason – NGE's lack of national recognition among departments of corrections – is not dispositive. If a set of beliefs is banned merely because no other DOC recognizes it, then such a policy amounts to a ban on new religions entirely. The second reason – NGE declares itself not a religion – is an issue of semantics. Wright testified "we do not believe in the word religion." He repeatedly referenced the mainstream, recognized religions at the prison as "Divine Cultures," believing in a "magical" or unseen God. Instead, NGE rejects the traditional prophet-based ideologies and seeks its own divinity. Despite denouncing the word "religion," it appears that the NGE has fundamental religious indicia which is analogous to mainstream religions.

In his complaint, Wright states, "I am a member of the Nation of Gods and Earths and has been [sic] since 1997. I am and has been [sic] Honoring partially our Honorary Days or Holy days, but not allowed to meet in the chaple [sic] area as a whole." Defendants confirmed that Wright has observed fasting rituals over the past few years. Defendants suggested at the hearing, however, that Wright's six citations for misconduct at the prison do not coincide with the NGE's values, suggesting Wright's beliefs may not be "sincerely held." Though Wright's past discipline indicates he has acted 'unrighteous' at times, his misconduct does not prove his asserted beliefs are the product of deception and fraud. Even the most devout are sometimes sinners. His several years of subscribing to the NGE, his fluency at the hearing regarding its teachings, and his observance of honorary fasting days strongly support the sincerity of his beliefs.

The importance of the NGE and its role in Wright's life appears equivalent to the role and importance of other faiths to their respective adherents. Wright appears to see the NGE and other accepted religions as mutually exclusive, further establishing their equivalence. First, he does not attend any other religious services. Second, he compared

the beliefs of the NGE and Nation of Islam, noting their fundamental ideological differences. Third, the fact that the NGE is Wright's last stop (for now) in a spiritual journey – that he "converted" from one recognized religion to the NGE – further supports the NGE's place in Wright's mind as a system of religious beliefs. Accordingly, I believe Wright's beliefs in the NGE are sufficiently religious to require First Amendment protection.

### E. Substantial Burden

As set forth above, I believe that Wright's adherence to the NGE constitutes a sincerely held religious belief. The Court must then determine whether Defendants' actions have infringed upon those religious beliefs. *Gladson*, 551 F.3d at 831. Here, Defendants have accommodated Wright on a "solitary basis." They have allowed Wright to fast on "honorary days" and to receive religious literature ("The Five Percenter"). Defendants refuse to allow Wright to meet in "Civilization classes," however, or to hold "Parliament." Substantially burdening one's free exercise of religion means that the regulation

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (quotations omitted). However, the court need no longer inquire whether a particular belief or practice is "central" to a prisoner's religion. *Gladson*, 551 F.3d at 832 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 725 (2005)).

At the evidentiary hearing, Defendants suggested that their refusal to allow group worship was influenced, in part, by the NGE's lack of doctrinal support for group worship. The Court cannot agree. Outside of prison, the NGE has weekly "Civilization" classes and a monthly "Universal Parliament" held wherever they can be accommodated.

22

A weekly meeting is in accordance with the NGE traditions and no less justified than mainstream religions currently accommodated at the prison. That the meetings are sometimes held in playgrounds or schools, rather than "places of worship" is, in my view, irrelevant.

While Wright is permitted solitary accommodations, the group worship ban on the NGE deprives Wright of a consistent and dependable way of practicing a major component of his faith. Gathering and discussing Supreme Mathematics and Supreme Alphabet is the most popular ritual of NGE adherents. Both monthly Universal Parliament classes and weekly Civilization classes are fixtures in the NGE community outside prison walls. I believe Defendants' refusal to allow group worship clearly places a substantial burden on Wright's free exercise of religion.

### F. Legitimate Penological Objective

If the Court determines that Defendants' refusal to allow group worship infringes upon Wright's sincerely held religious beliefs, then it must determine whether the restriction "is reasonably related to legitimate penological objectives." *Gladson*, 551 F.3d at 831. In making that determination, the Court must consider the four factors identified in *Turner v. Safley*, 482 U.S. 78 (1987). However, the Court gives "great deference to the judgment and expertise of prison officials, particularly with respect to decisions that implicate institutional security." *Gladson*, 551 F.3d at 831-32 (quoting *Murphy v. Mo. Dept. of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004)).

The Supreme Court established the four-factor *Turner* analysis to evaluate the reasonableness of a given regulation. The four inquiries are: (1) whether there is a "valid rational connection" between the restriction and the legitimate interest put forward to justify it; (2) whether there are other ways for the prisoner to exercise his rights despite the restriction; (3) the impact an accommodation may have "on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are alternative ways to achieve the penological interest. *Turner*, 482 U.S. at 89-90. In *O'Lone v. Estate*

*of Shabazz,* 482 U.S. 342, 349 (1987), handed down one week after *Turner,* the Court applied the *Turner* factors in an action involving the free exercise of religion. In concluding that the regulations did not offend the Free Exercise Clause of the First Amendment to the United States Constitution, the Court took "this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to 'substitute our judgment on difficult and sensitive matters of institutional administration,' for the determinations of those charged with the formidable task of running a prison." *Id.* at 353 (citation omitted). In the absence of substantial evidence indicating officials have exaggerated their response to prison security considerations, courts should ordinarily defer to their expert judgment. *Fegans v. Norris,* 537 F.3d 897, 903 (8th Cir. 2008).

### 1.   Is There a "Valid Rational Connection" Between the Restriction on Group Worship and the Prison's Legitimate Interests?

The first factor in the *Turner* analysis is whether there is a valid rational connection between the restriction and the legitimate interest put forward to justify it. *Turner,* 482 U.S. at 89. *See, e.g., Goff v. Graves,* 362 F.3d 543, 549 (8th Cir. 2004) (finding a rational connection between the ban on permitting food trays to be taken to prisoners in lock-up and the governmental interest in maintaining prison security).

Here, Defendants' principal objection to group worship appears to be related to security concerns. "Institutional security is 'the most compelling government interest in a prison setting.'" *Murphy,* 372 F.3d at 983 (quoting *Goff* at 549). When asked at the hearing whether the NGE is a security threat group, Warden Fayram responded "I'm not aware that it has absolutely been determined as that, but I know there have been concerns about – about it being – there have been questions as to whether or not it's a religion or a security threat group." When asked the same question, Treatment Director Dietsch testified: "NGE is not considered a threat group. It's suspected of threat group type behavior."

In arguing that the NGE may pose a security threat, Defendants cite three concerns. First, Defendants argue that the NGE promotes racist views which could promote tension

and violence within the institution.  For example, the syllabus prepared by NGE's national office of cultural affairs states that "[t]o us God is beautifully real the Blackman in the flesh."  Chaplain Jenkins testified that his research revealed that while the NGE "speaks of being neither pro-black nor anti-white, but anti-devilish," further review of the material suggests that the NGE believes "those of the white race are defined as the devil."

Wright disputes the assertion that the NGE is racist.  According to Wright, "we don't strive for superiority, we're not anti-white, we're not pro-black, we are pro-righteousness."  The syllabus prepared by the National Office of Cultural Affairs states:

> As Black people it is natural that god reflect our identity.  For the NOGE God is Black, for Chinese people God is Chinese, for Indian people God is Indian, for Europeans God is white.  No people are monolithic and while naturally these are the facts when it comes to God anybody can embrace God as they see fit.  Chinese people can embrace a white version of God, white people can embrace the black reality of God of the NOGE; you understand?  The NOGE denies no man, regardless of color from embracing the reality of God.

Plaintiff's Exhibit B at 2.

Second, Chaplain Jenkins testified that the NGE showed certain indicia of gangs, including what "looked like a gang hierarchy."  That is, Chaplain Jenkins' investigation revealed that members of the NGE are referred to as ciphers, lieutenants, and captains.  The Court notes, however, that most religions have some hierarchal structure.  For example, Catholics recognize priests, bishops, and cardinals.  Indeed, one of the "accoutrements of religion" identified in *Meyers* is the group's "structure or organization."  *Meyers*, 95 F.3d at 1483.  Third, Chaplain Jenkins expressed concern that the Supreme Alphabet and Supreme Mathematics recognized by the NGE are capable of masking gang communications within a prison.  No further testimony was presented in this regard.

The Court must, of course, give great deference to the judgment and expertise of prison officials on issues of institutional security.  *Gladson*, 551 F.3d at 831; *Murphy*, 372 F.3d at 983.  In this case, however, it would appear that Defendants' concerns are largely

speculative. Both Warden Fayram and Treatment Director Dietsch testified that the NGE has not been designated as a security threat group within the Iowa Department of Corrections. Fayram conceded that he did not know of any violence that could be attributed to the NGE or the "Five Percenters." While Wright admitted that he was previously a member of a gang, Defendants offered no testimony that he currently has any gang involvement. Accordingly, it appears that Defendants' refusal to allow the NGE group worship based on security concerns is premature, at best.

### 2.   Are There Other Ways for Wright to Exercise His Religion Despite the Restriction?

The second factor identified in *Turner* is whether there are other ways for the prisoner to exercise his rights despite the restriction. *Turner*, 482 U.S. at 90. Wright has been permitted to exercise some aspects of his religion. Specifically, Defendants have accommodated Wright's observance of "Honorary Days" by assisting his fasting, and have allowed him access to religious material for self-study. However, an important aspect of the NGE is weekly civilization classes and monthly Parliament. Defendants' restriction on group worship appears to restrict Wright's free exercise of this aspect of the NGE, without any alternative.[24]

### 3.   What Impact Would Group Study Have on Others and on Prison Resources?

The third consideration described in *Turner* is the impact an accommodation will have on guards and other inmates, and on the allocation of prison resources generally. *Id.* Warden Fayram testified in detail regarding the significant budget constraints placed on the prison. Defendants argue that if the NGE is permitted group worship, it will place an

---

[24] The testimony of Chaplain Jenkins was somewhat ambiguous in this regard. In response to questioning by Wright, Jenkins testified: "We have guys that come up and study in groups of one and two all the time. I've never received that request from you. Not even verbally." Accordingly, it appears that Chaplain Jenkins may entertain the possibility of allowing Wright to "study" in a small group.

additional strain on limited resources. Chaplain Jenkins also testified that there is simply no more time or space available in the chapel area on Sundays.

Warden Fayram's budget concerns are undoubtedly real. If the NGE's membership grew to a significant number, then it may affect staffing allocations. It is the Court's understanding that a security officer is generally stationed in the chapel area on Sundays because of the number of prisoners going in and out, but no security officers are routinely present on other days.

The "chapel schedule of activities" at the prison was introduced as Defendants' Exhibit 6. On Sundays, the chapel is open from 7:30 a.m. until 4:00 p.m. and accommodates Catholics, Pentecostal Christians, Buddhists, Jehovah's Witnesses, Muslims, a "music service," and a "spiritual foundations class." On Monday through Friday, the chapel accommodates Kerygma, "education for ministry," "theological book club," Jehovah's Witnesses study, Apostolic Assembly Bible study, spiritual writing, Muslim Talim/Arabic study, Satanists, Wicca ritual, Asatru ritual, Spanish Bible study, Native American drums, Protestant music team practice, Moorish Science Temple, and other related activities.

Following the hearing at the prison on February 22, 2012, I took a brief tour of the chapel area. In addition to a large room constituting the chapel, there are two adjacent rooms which are apparently used for religious study or worship. One of the rooms is larger and can accommodate a significant number of persons, while the other room is smaller and can comfortably accommodate a small number. Given the number and wide range of religious groups which are accommodated at the prison, the Court is not convinced that space is unavailable for the NGE. While Wright states in his request for recognition that the NGE holds Parliaments "every third Sunday of every month," there is no indication that the weekly civilization class must be held on a Sunday. It appears that space is available during the week in the chapel or an adjacent room.

### 4.    Are There Alternative Ways to Achieve the Prison's Interests?

A restriction on a prisoner's free exercise of religion must be reasonable.  The *Turner* Court suggested that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation. (citation omitted) By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."  *Turner*, 482 U.S. at 90.   Here, Defendants' refusal to allow group worship is related primarily to security concerns and limited resources.  As previously discussed, the security concerns seem premature.  The NGE is not designated as a security threat group, there is no evidence that Wright has any current gang involvement, and there has been no violence attributable to the NGE. Furthermore, while the prison's resources are not unlimited, it appears that a weekly civilization class and a monthly Parliament could be accommodated at minimal cost.

After considering the four *Turner* factors, and giving great deference to the judgment and expertise of Defendants, the Court nonetheless concludes that the refusal to allow group worship is not reasonably related to legitimate penological objectives. *Gladson*, 551 F.3d at 831.  Accordingly, *if* the district court concludes that this issue is ripe for determination, then I respectfully recommend that Defendants be required to accommodate Wright's free exercise of religion by allowing weekly civilization classes and a monthly Parliament.

### V. SUMMARY

In summary, I believe that Wright's adherence to the NGE constitutes a sincerely held religious belief which is entitled to protection under the Free Exercise Clause of the First Amendment to the Constitution.  In addition, I believe that Defendants, acting under color of state law, infringe upon Wright's free exercise of his religion by prohibiting weekly civilization classes and monthly Parliament.  Furthermore, I do not believe there is a valid rational connection between the restriction on group worship and the legitimate interests put forward by Defendants to justify it.  Finally, I believe Wright exhausted his

28

administrative remedies prior to filing the instant action. Nonetheless, because Wright is currently a "congregation of one," the action is not ripe and, therefore, should be dismissed.

## VI.  RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Complaint (docket number 3) filed by the Plaintiff be **DISMISSED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on February 22, 2012.*

DATED this  18th  day of June, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA